BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
JUDITH R. HARPER, OSB #903260
Assistant United States Attorney
Judi.Harper@usdoj.gov
310 West Sixth Street
Medford, OR 97501
Telephone:  (541) 776-3564
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **1:21-cv-00115-BR** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT,** *in rem,* **FOR FORFEITURE** |
| **$131,735.00 U.S. CURRENCY,** *in rem,* | |
| **Defendant.** | |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Judith R. Harper, Assistant United States Attorney, for its complaint *in*

*rem* for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to

21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

II.

**Complaint** *in rem* **for Forfeiture**                                                    **Page 1**

Defendant, *in rem*, **$131,735.00** U.S. Currency, was seized in the District of Oregon, and is now and during the pendency of this action will be within the jurisdiction of this Court.

III.

Defendant, *in rem*, **$131,735.00** U.S. Currency represents proceeds traceable to an exchange for controlled substances or were used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 841(a)(1), and is forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the declaration of David Wentworth, Special Agent, Drug Enforcement Administration, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, plaintiff, United States of America, prays that due process issue to enforce the forfeiture of defendant, *in rem*, **$131,735.00** U.S. Currency, that due notice be given to all interested persons to appear and show cause why forfeiture of this defendant, *in rem*, should not be decreed; that due proceedings be had thereon; that this defendant be forfeited to the United States; that the plaintiff United States of America be awarded its costs and disbursements incurred in this action.

DATED:  **January 25, 2021**           Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*s/ Judith R. Harper*
**JUDITH R. HARPER**
Assistant United States Attorney

**VERIFICATION**


I, Agent David Wentworth, declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Special Agent with the Drug Enforcement Administration and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.


*s/David Wentworth*
Agent David Wentworth
Special Agent
Drug Enforcement Administration

## DECLARATION of DAVID WENTWORTH

I, David Wentworth, do hereby declare:

## BACKGROUND/EXPERIENCE

1.       I am a Special Agent (SA) with the Drug Enforcement Administration (hereinafter "DEA"), United States Department of Justice. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I also am responsible for investigating drug related crimes within the United States. Under 21 U.S.C. § 878. I am empowered to make arrests, obtain and execute search warrants, and to make seizures of property pursuant to Subchapter I of Chapter 13 of Title 21 United States Code.

2.       I am currently assigned to the DEA Medford Resident Office.  I have been employed with the DEA since July 2014.  Prior to my employment with the DEA from 2009 to 2014, I was a federal criminal investigator of the Marine Corps Criminal Investigative Division (hereinafter "CID") at Camp Pendleton in California.  Besides my training with the CID I completed the 17-week DEA Basic Agent Training program in Quantico, Virginia.  The training focused on methods of unlawful drug trafficking; the identification of controlled substances; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activities; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets intended to be used to facilitate drug violations.  My specialized training has included, but is not limited to, the investigation of the manufacture, possession, and distribution of controlled substances listed within the Controlled Substance Act; executing search and arrest warrants

involving drug offenses; gathering drug and non-drug evidence; participating in

undercover assignments; supervising and utilizing informants; investigating clandestine

laboratories, smuggling, and money laundering; and monitoring drug-related

conversations via Court authorized electronic eavesdropping.

## PURPOSE OF THE AFFIDAVIT

3.      This declaration is submitted in support of a civil complaint *in rem* for

forfeiture of $131,735.00 United States Currency seized from Caitlyn LECOMPTE on

July 29, 2020, at the Medford International Airport, in Medford, Oregon.  As discussed

below, I believe there is probable cause that the $131,735.00 is subject to forfeiture

pursuant to 21 U.S.C. § 881(a)(6) as moneys furnished or intended to be furnished by any

person in exchange for a controlled substance, proceeds traceable to such an exchange, or

moneys used or intended to be used to facilitate violations of 21 U.S.C. § 841(a)(1). This

affidavit does not include all of the facts known to me regarding this investigation, only

those sufficient to establish probable cause to seize the above referenced Currency.

## SUMMARY OF THE INVESTIGATION

4.      On July 29, 2020, DEA Medford RO investigators received information

from DEA San Diego, regarding suspicious activity by Steven and Caitlyn LECOMPTE

(hereinafter, S. LECOMPTE and C. LECOMPTE, respectively), and Kerry ALVIS III

(hereinafter, ALVIS), who were believed to be flying into the Medford International

Airport (MFR) later the same evening and originally departing from New Orleans,

Louisiana earlier the same day.

5.      At approximately 7:30 p.m. investigators from the Medford RO, Oregon

State Police (OSP) and Medford Police Department (MPD) responded to MFR and

established surveillance.  Upon arrival of Alaska Airlines Flight #AS2022 from Portland, Oregon, I along with, TFO Scott Logue, Sgt. Brandon Boice and Ofc. Rob Havice went to the secured area of the airport where the baggage is off loaded from the baggage shuttle to the ramp, which conveys the luggage to the MFR baggage claim area. Investigators identified four large suitcases with checked luggage tags in C. LECOMPTE's name and an additional two large pieces of luggage, which had checked luggage tags in the name of ALVIS.  Investigators laid the six bags on a line and Ofc. Havice ran his four-odor narcotics detection K-9 along each of the bags.  Ofc. Havice informed investigators that his K-9 had alerted to each of the six bags, which were subsequently detained by investigators.  The odor resembling that of marijuana emanating from each piece of baggage was strong enough to be detected by investigators upon handling them.  Meanwhile, SA Lyons identified C. LECOMPTE, S. LECOMPTE, and ALVIS, based upon their previously acquired driver's license photos, who were waiting by the baggage claim area of MFR.

6.     TFO Logue, Sgt. Boice, Ofc. Havice, and I brought the detained bags into the baggage claim area, where C. LECOMPTE, S. LECOMPTE, and ALVIS all approached investigators upon noticing the baggage.  I presented my badge and identified myself as a DEA agent to all three and asked if the bags belonged to them, and they collectively responded that they did.  I asked ALVIS if there was any reason a narcotics detection K-9 might alert to the presence of narcotics on his bags to which he shook his head and replied "no."  While addressing all three, I stated that investigators would like to speak to them individually about their baggage and requested that they move to a more private area of the airport to do so.  C. LECOMPTE, S. LECOMPTE, and ALVIS agreed

Declaration of David Wentworth                                                    Page 3

and followed me and the other investigators to the bar/restaurant area upstairs at MFR, which was closed for business during that hour.

### Interview of Kerry ALVIS III

7.      I requested to speak to ALVIS separately in the outdoor patio area of the restaurant to which ALVIS agreed.  I asked ALVIS, which of the items of luggage were his and he proceed to grab two of the large black suitcases that had checked bag tags with his name on them.

8.      Sgt. Boice and I interviewed ALVIS.  ALVIS was seated at a table in the public patio area of the MFR restaurant with an unobstructed view of the door. As ALVIS sat down, he immediately began manipulating his cell phone.  I requested that ALVIS not communicate with his phone for the duration of the interview for officer safety, and ALVIS placed his phone on the table in front of him.  Throughout the interview, ALVIS continued to receive messages on his phone.

9.      I asked ALVIS where he and his friends were originating from and ALVIS responded, "New Orleans."  I asked where they were ultimately headed.  ALVIS took a long pause before answering the question as if he was trying to think of the answer. Ultimately, ALVIS stated that they were headed to Northern California.  I inquired as to where specifically, but ALVIS was unable to answer or name any specific towns they would be traveling to.  I asked ALVIS what the purpose of their travel to Northern California was and ALVIS took another long pause before answering that they were coming out here to hike.  I asked ALVIS if he was a hiking enthusiast and ALVIS stated that he had just recently gotten into it.  I asked ALVIS where specifically they intended to hike, and if there were any trails that had enticed them to travel all the way from New

Orleans to hike.  ALVIS was unable to name any particular trails, or even any particular

towns in Northern California that they would be traveling near.

      10.    I asked when ALVIS and his friends would be returning to Louisiana and

if they had purchased return tickets yet.  ALVIS took another long pause before stating

that he didn't know how long they would be out here and stated that they did not yet have

return flights booked.  ALVIS stated that C. LECOMPTE was his first cousin and that

ALVIS and C. LECOMPTE were here to meet family, with whom they would be staying.

ALVIS stated he didn't know S. LECOMPTE and did not believe that he was of any

relation to ALVIS.  I asked ALVIS who of their (he and C. LECOMPTE's) family they

would be visiting, specifically, and where they lived. ALVIS was unable to provide any

names, relations, or even vague geographic locations pertaining to whom they were

supposed to be meeting and residing with during their time in Northern California.  I

explained that I thought that was strange that ALVIS would travel across the country with

someone he didn't even know to go hiking in a place that he could not name.  ALVIS just

shook his head without giving a verbal response.  I asked ALVIS if someone was

supposed to be picking them up or if they were planning to rent a car or take a taxi, to

which ALVIS stated he did not know.  During the interview ALVIS continued to look in

the direction of where C. LECOMPTE was being interviewed, though it was out of sight

from his own vantage.

      11.    I reminded ALVIS that they were being interviewed because a narcotics

detection K-9 had alerted to all six of their checked bags.  I looked at the two bags, which

ALVIS had claimed as his and informed AVLIS that I would like to search the bags and

asked ALVIS if that would be alright.  ALVIS responded, "Yeah, you gotta." I went to

Declaration of David Wentworth                                      Page 5

open the first bag and observed a small travel padlock on the zipper. I requested the key from ALVIS, who then stated that C. LECOMPTE had the key. I observed that it was strange that C. LECOMPTE would maintain the keys to ALVIS' luggage, to which ALVIS did not respond. Sgt. Boice retrieved the keys from C. LECOMPTE for both pieces of luggage with ALVIS' name on the airlines checked luggage tag. Prior to searching the luggage, I asked ALVIS if the bags contained any guns, drugs, or large amounts of currency. ALVIS took a long pause and said, "No."

    12.    Upon opening the first piece of luggage I detected the overwhelming odor of what I know to be that of marijuana. I observed the contents of the luggage, which consisted almost entirely of camouflage cargo shorts that still had the store tags on them, in addition to a few other items of clothing. Upon searching the pockets of the cargo shorts in the bag, I discovered rubber banded bundles of cash in many of the pockets, most of which had a hand-written label of "$2,000" inside the rubber band. Most shorts searched contained currency in the pockets. As I began removing currency from the bag and stacking it on the table that ALVIS was sitting at, ALVIS did not say anything. I opened the second piece of luggage with another key also provided by C. LECOMPTE, which contained more of the same camouflage cargo shorts containing many of the same rubber banded bundles of cash in the pockets. The second bag also smelled of marijuana. I noted that the contents of the bag were not consistent with what someone would expect to see in the bag of someone who traveled across the country to go hiking, or even to stay with family for an undetermined amount of time. By this point in the interview, C. LECOMPTE had consented to a search of all of her luggage items as well, which also yielded a large amount of currency concealed in the same fashion.

Declaration of David Wentworth                                          Page 6

13.     I asked ALVIS why there was so much cash in the luggage when he had just informed me that there was no currency in the bags.  ALVIS responded that he did not know anything about the currency and that the bags were not in fact his, insisting that the only bag there that was his was a smaller carry-on sized roller bag that had been contained in one of the other larger pieces of luggage in S. LECOMPTE's name.  This is contrary to ALVIS's initial claim that the two suitcases with his name on the tags did belong to him.  Sgt. Boice retrieved this luggage item from the area where S. LECOMPTE was being interviewed.  I observed that I thought it was strange that ALVIS would put his luggage inside a mostly empty larger suitcase, which was checked under someone else's name.  ALVIS began to explain that he wasn't sure how that happened and how somehow the tags must have been switched in the process.  I asked ALVIS if he packed the bags containing the currency and checked them in at the airport in Louisiana, to which ALVIS responded that he didn't know anything about those two bags and that the only bag that was his was the smaller roller bag, which Sgt. Boice had retrieved after the fact.  When asked who the bags belonged to ALVIS stated that "I don't want to put the blame on her (motioning towards the area where C. LECOMPTE was being interviewed), but…"

14.     I asked ALVIS what he believed the cash was for. ALVIS responded that he didn't even know it was there.  I informed ALVIS that I believed C. LECOMPTE, S. LECOMPTE and ALVIS were traveling to Southern Oregon and/or Northern California for the purpose of purchasing marijuana before exporting it back to Louisiana.  ALVIS appeared to feign surprise at the statement before repeating it back to SA Wentworth and adding, "Is that what you think we're here to do?! Oh no, no…"  Based upon my training

and experience in conducting interviews and interrogations, I know that people who are caught off-guard when confronted with a direct accusation will often repeat the accusation back in order to buy time to formulate a more believable answer. I informed ALVIS that he and his companions could be faced with criminal charges for exporting marijuana back to Louisiana and that I wanted to know who was in charge of the plan to travel to Medford. ALVIS responded that "I guess I'll just have to take my lumps then" and added, "I ain't no snitch or nothing."

15.     Based upon my training and experience in prior investigations conducted by the Medford RO, including interviews of subjects and informants, reviews of cell phones and documents, and through other investigative techniques, I have observed several common techniques by which out-of-state buyers often transport currency and marijuana. Once such method involves obtaining a one-way flight from the originating state and concealing the currency in clothing (often times new with the tags still on) within checked baggage. Once in the area they will purchase marijuana from a local producer before concealing it in the same luggage, before renting a vehicle and driving it back to their originating state. This is why the luggage often smells like marijuana after they have completed this process on at least one prior occasion.

16.     I asked ALVIS to describe the purpose and processes of planning for the trip with C. LECOMPTE and S. LECOMPTE. ALVIS stated that he had recently lost a cousin to a drug overdose and that his grandmother back in Louisiana was sick, so the three of them were all coming out to Oregon and Northern California to just "get away" and hike. I asked ALVIS what he does for work. ALVIS responded that he currently collects $3,000 a month in unemployment. I continued to inquire for names of anyone

local to Southern Oregon or Northern California that they were supposed to be meeting with, but ALVIS stated he did not know.

17.    I then informed ALVIS that I believed the information ALVIS had provided up until this point in the interview was very unlikely to be true and requested that ALVIS allow Sgt. Boice to review some of the more recent messages on ALVIS' phone in order to corroborate the information he had provided.  ALVIS consented, unlocked his phone and provided it to Sgt. Boice to review, while ALVIS watched. ALVIS stated the phone number of his phone was 985-791-XXXX

18.    During the review of the phone Sgt. Boice located a flight itinerary record from expedia.com for another flight from New Orleans, connecting in Denver and ultimately landing in Medford, OR, on July 23, 2020 (just 6 days earlier), under ALVIS's name.  I asked ALVIS how many times he had traveled into MFR before.  ALVIS initially said he didn't remember, but ultimately stated he had been here three times since June 2020.  ALVIS could not remember a specific date in June but remembered that he was in Medford on July 4, 2020.  ALVIS also claimed to not remember the third date that he was in Medford during that time frame.  I asked ALVIS details about his prior trips. ALVIS stated that they hiked during those trips, but again was not able to provide any details regarding who they met or stayed with, what modes of transportation they used, or where they hiked, or any sort of more meaningful purpose of those trips other than simply hiking.  ALVIS did state that they stayed at an Airbnb on one occasion but did not know where it was or who paid for it or for how long they stayed in it.  ALVIS also mentioned stopping at a marijuana dispensary while they were traveling in the area.  I asked whether

that was in Oregon or California.  ALVIS seemed to wonder to himself aloud stating, "uh, weed's legal in Oregon… no California, so… yeah."

19.     Sgt. Boice located an iMessage conversation between ALVIS and a contact named "Bryce Colemen," later identified as Bryce COLEMAN, with assigned phone number 504-508-XXXX.  The contact photo depicted four people, one of whom was ALVIS, one who appeared to be C. LECOMPTE, one black female adult, and one younger white male adult matching the Facebook photo for COLEMAN referenced later in this declaration.  The messages are summarized unless otherwise quoted directly. These messages were photographed in their original context.

- On July 3, 2020, COLEMAN, "Send me a video how u pack each one."

- ALVIS sends a video with the starting image of the interior of a black suitcase packed neatly with clothing.

- COLEMAN, "Can u put more clothes."

- On July 4, 2020, COLEMAN states, "His phone off."

- ALVIS responds, "I check all the spots the say he be at, if I wait any longer ima miss my flight."

- COLEMAN, "u jus gotta come without him."

- ALVIS, "Bring all 4?"

- COLEMAN, "Will it be to heavy if u put it in just two?"

- ALVIS, "No."

- COLEMAN, "Ok move it to just two. Make sure on top u got enough empty clothes."

- ALVIS, "ok."

- COLEMAN, "Man this dude got me so mad rn."

- ALVIS, "Me to, like I still gotta stop at Walmart."

- COLEMAN, "I well told him. Lemme kno when u leave."

- ALVIS, "Ight, I'm at maws now repacking."

- COLEMAN acknowledges.

- ALVIS, "Leaving now."

- COLEMAN, "Are they super heavy or normal." ALVIS, "Normal."

- COLEMAN, "U to Nola yet"

- ALVIS, "Yeah, got the locks pulling up to CAITLYN house now."

- COLEMAN, "OK. U made it threw?"

- ALVIS, "I'm almost there."

- COLEMAN, "U ain't make it to the airport yet?"

- ALVIS, "Just pulling up."

- COLEMAN, "Nah hold up I'ma move the flight. The bags won't make it on. They let u change it."

- ALVIS, "I gotta pay 2sum extra but she took my id and went to somebody so idk rn."

- COLEMAN, "Y it's the same price."

- ALVIS, "She said it's paired prices that was paid for, now I'm getting it individual."

- COLEMAN, "Ok. Everything good."

- ALVIS, "Yeah."

- COLEMAN, "So what time u land?"

- ALVIS, "I think she said 4:05."

- At 3:07 p.m., COLEMAN, "U good."

- ALVIS, "yeah. 30 min left."

- At 4:15 p.m., COLEMAN, "U landed."

- ALVIS, "Yeah, I'm with Shelly."

- COLEMAN, "Bags are good"

- ALVIS, "Yeah."

- The conversation continues on July 7, 2020 at 12:47 p.m.

- COLEMAN, "Ya'll good." ALVIS, "Yeah."

- COLEMAN, "You going to Houma right wen u land?"

- ALVIS, "After yeah, CAITLYN said she going tomorrow."

- COLEMAN, "Can u bring those suit cases right wen u land ima have Lc waiting."

- ALVIS, "Yeah. Tell him just come to CAITLYN's. She wants me to sleep."

- COLEMAN, "Yea but everything else of his is gonna be in Houma with Chad. Unless she can have someone open the apartment for him to drop them off"

- ALVIS, "What time chad lands?" ALVIS, sends a photograph of a calculator app with the number 10,300 displayed. COLEMAN, responds, "Ok."

- The conversation continues on July 8, 2020 at 11:57 a.m.

- COLEMAN, "U still at Caitlyn"

- ALVIS, "No we at the funeral home. We brought it to ya MAWMAW's."

- COLEMAN, "Ok everything at my grandmas."

Declaration of David Wentworth                                                    Page 12

- ALVIS, "Yeah."

- COLEMAN, "Ok Ya'll good.

- ALVIS, "Yeah we food just left."

- COLEMAN, "He cashing out on the 9 he picking up too." ALVIS acknowledges.

- COLEMAN, "U got it."

- ALVIS, "Yeah dropping it off to maw now."

- On July 22, 2020, ALVIS asks, "You bought the ticket?"

- COLEMAN responds that he is about to and that he had forgot, adding, "Been messing with trimmers (Agent note: likely referring to marijuana trimmers). U got the clothes and stuff." COLEMAN sends ALVIS a screenshot of the travel itinerary referenced above and asks ALVIS, " Y u ain't give that money to Lynn this morning."

- ALVIS, "I did it's in the suit case. Tell moon to bring it. I'm dealing with this camper and stuff."

- COLEMAN, "Ok. Can u meet him by the shop then?"

- ALVIS, "Yeah, lmk when to meet him."

- COLEMAN, "He gonna be there in 15 min." ALVIS says he's heading there now.

- The same day at 9:15 p.m., ALVIS sends COLEMAN a video of the inside of the black suitcase containing clothes.

- ALVIS, "I forgot locks."

- COLEMAN, "OK."

- ALVIS, "What's ya mawmaw number she said to call her before I go over in the am."

- COLEMAN, "9858049092. They ain't got locks at like Walgreens or cvs."

- ALVIS, "Ima see if I have time to stop."

- July 23, 2020 at 6:07 a.m., COLEMAN, "U made it."

- ALVIS, "to the airport but I couldn't get the locks."

- COLEMAN, "Risky."

- ALVIS, "I know, I wasn't gone make it on—" the message cuts off and this is the end of the messages captured by photograph.

20.     This concluded the review of the content of ALVIS phone.  Based upon these messages between ALVIS and COLEMAN, I believe ALVIS and C. LECOMPTE have endeavored on more than one prior occasion to transport large amounts of currency from Louisiana, at the direction of COLEMAN.  Sgt. Boice and I continued to question AVLIS regarding the numerous inconsistencies in his story, as well as his obvious lack of truthfulness regarding his involvement in transporting the currency, however, ALVIS did not provide any additional information and the interview was concluded.  ALVIS departed with C. LECOMPTE and S. LECOMPTE, and all the remaining luggage upon completion of the other interviews.

**Interview of Steven LECOMPTE**

21.     SA Joseph Lyons and TFO Ryan Neuenschwander interviewed S. LECOMPTE and related the following information to me.  S. LECOMPTE stated that he lived in Houma, Louisiana and presented his Louisiana Driver's license.  SA Lyons asked if he could search the two pieces of luggage bearing S. LECOMPTE's name and S.

LECOMPTE gave consent.  Both pieces of luggage were locked.  SA Lyons asked S.

LECOMPTE for the keys to the locks and S. LECOMPTE stated that C. LECOMPTE

had the keys.  SA Lyons asked C. LECOMPTE for the keys and she provided them.

      22.    SA Lyons opened the first piece of luggage which was a large suitcase.

SA Lyons and Ofc. Havice both noted that upon opening the large suitcase, they detected

the odor of marijuana.   Inside the large suitcase was a smaller suitcase which filled about

half of the large suitcase.  SA Lyons asked S. LECOMPTE why he had packed like this

and S. LECOMPTE stated that C. LECOMPTE had packed the luggage in that manner.

SA Lyons searched this luggage and found various articles of clothing.

      23.    SA Lyons then opened the second piece of luggage which was another

large suitcase.  Inside the second large suitcase was a second smaller suitcase. SA Lyons

again asked S. LECOMPTE why it had been packed this way.  S. LECOMPTE stated that

the second smaller suitcase was not his but belonged to ALVIS.  S. LECOMPTE stated

that C. LECOMPTE had put this suitcase in his name and had placed the second smaller

suitcase inside of it, but that the second smaller suitcase belonged to ALVIS.  SA Lyons

then took the second small suitcase to the area was ALVIS was being interviewed.  SA

Lyons asked ALVIS if the second small suitcase belonged to him and ALVIS

acknowledged that it did.  ALVIS consented to a search of the suitcase, which was found

to contain only clothes.

      24.    S. LECOMPTE stated that he was the cousin of C. LECOMPTE but that

he did not know ALVIS.  S. LECOMPTE stated that he knew ALVIS was a friend of C.

LECOMTE and had heard they might be related but that he was unsure.  S. LECOMPTE

stated that he had been detained several times by the police but that he had never been

booked.  S. LECOMPTE stated that he used to sell appliances but was currently

unemployed. S. LECOMPTE stated that he receives $833 a week of unemployment

benefits.

25.     S. LECOMPTE stated that C. LECOMPTE's brother, Bryce COLEMAN,

lived in Southern Oregon and had invited S. LECOMPTE to live in Southern Oregon as

well.  S. LECOMPTE stated that COLEMAN had bought him a ticket and that S.

LECOMPTE was moving to Southern Oregon.  S. LECOMPTE did not know what town

or address COLEMAN was living in.

26.     S. LECOMPTE stated that his friend, Cody ROBINSON, was a Louisiana

born rapper who had moved to Southern California.  S. LECOMPTE stated that

ROBINSON was currently in Southern Oregon on a visit to film rap videos and was

going to pick S. LECOMPTE up from the airport.   During the interview, ROBINSON

called and S. LECOMPTE told him they were being interviewed by the police and he

would not be leaving for a few minutes.  S. LECOMPTE stated that he would assist

ROBINSON in making the rap videos by being part of ROBINSON's entourage.  TFO

Neuenschwander asked if ROBINSON's videos in Oregon were being filmed in

marijuana grows and S. LECOMPTE acknowledged that they were.

27.     S. LECOMPTE stated that he did smoke marijuana but that he did not deal

marijuana.  S. LECOMPTE allowed investigators to search through his recent texts,

which did indicate that LECOMPTE bought marijuana from a person saved under the

contact name "Will Robinson."

28.     By this point in the interview, investigators had found numerous bundles

of currency in C. LECOMPTE's luggage and had laid them out on the table within

eyesight of S. LECOMPTE.  SA Lyons asked S. LECOMPTE if he knew that his other travelling companions were carrying US currency and S. LECOMPTE stated that he did not.  SA Lyons asked if S. LECOMPTE knew anything about the plans of his travelling companions, including if they were coming out to buy marijuana and S. LECOMPTE stated that he did not know why they were coming out, nor did he make any mention of plans to purchase real estate, as is subsequently claimed.

### Interview of Caitlyn LECOMPTE

29.      TFO Logue and Detective Lee interviewed C. LECOMPTE at a dining table in the seating area of the restaurant upstairs and reported the following information to me.  TFO Logue confirmed which two bags C. LECOMPTE claimed as her own.  TFO Logue brought the bags over near the area of the interview.  The two bags claimed by C. LECOMPTE were a large gray rolling suitcase and a large navy blue with yellow trim rolling suitcase.  Both bags had airline luggage tags with C. LECOMPTE's name printed on them.

30.      TFO Logue asked C. LECOMPTE about her travel plans. C. LECOMPTE indicated C. LECOMPTE and ALVIS and S. LECOMPTE, whom she identified both as her cousins, flew into Medford and would be picked up by a family member from Redding, California to drive to Redding for a visit with C. LECOMPTE's father and other family.  C. LECOMPTE said they were traveling to get out of New Orleans for a while because C. LECOMPTE's sister recently passed away from a heroin overdose in Louisiana.  TFO Logue asked C. LECOMPTE about her employment and source of income.  C. LECOMPTE indicated she works at a "Sampling Company" and makes $10 per hour.   C. LECOMPTE described her work as going to retailers, like Walmart, with

product samples to market products to the retailer. C. LECOMPTE further indicated she has not been working much recently, due to the Covid-19 pandemic. C. LECOMPTE said she was not receiving any unemployment benefits due to her drastically reduced schedule. TFO Logue inquired about C. LECOMPTE's living situation. C. LECOMPTE advised she rents a place with one roommate. C. LECOMPTE said the rent is $1,000 per month. C. LECOMPTE indicated the rent is typically split evenly with the roommate, but that C. LECOMPTE and the roommate help each other out with rent if one of them is short on money in a given month.

    31.    TFO Logue asked C. LECOMPTE if there was any reason a narcotics detection K-9 would have alerted to the presence of a narcotic odor coming from her luggage. TFO Logue further explained the K-9 was trained to alert to the odor of methamphetamine, heroin, cocaine and marijuana. C. LECOMPTE said she had no idea. TFO Logue asked C. LECOMPTE if she was traveling with any large amounts of cash. C. LECOMPTE became very evasive with TFO Logue's questions and began to provide very vague answers. C. LECOMPTE replied to the question about cash with saying she had a little cash. TFO Logue asked what she meant by "a little" cash. C. LECOMPTE spoke more softly and said she had "some" cash. TFO Logue again asked what she meant. C. LECOMPTE replied saying she had "a few thousand." TFO Logue asked if "a few" meant $3,000. C. LECOMPTE said she might have about $5,000 in cash. C. LECOMPTE said the cash was in her blue suitcase. TFO Logue asked C. LECOMPTE for consent to search her luggage (she had previously offered consent without being prompted). In response to the request to search her luggage, C. LECOMPTE removed several keys from her purse and she slid them across the table toward TFO Logue while

Declaration of David Wentworth                                                    Page 18

nodding in the affirmative.  C. LECOMPTE said the keys would open the locks on her

two suitcases, as well as the locks on the other four suitcases.  The keys provided fit the

locks on all the suitcases.

32.     TFO Logue retrieved the large blue and yellow suitcase and conducted a

search of it, while TFO Lee searched C. LECOMPTE's large gray rolling suitcase.  Upon

opening the blue suitcase, TFO Logue observed several articles of newly purchased

clothing.  There were several pairs of cargo style shorts, with tags still attached, rolled up

inside the suitcase.  Additionally, there were several white T-shirts that appeared to have

never been worn.  The suitcase also contained a bed sheet.  TFO Logue did not observe

any clothing items that appeared to be part of a previously owned wardrobe (all articles

of clothing appeared brand new and never worn).  TFO Logue noted that the clothes in

the suitcase were predominantly men's clothing.  TFO Logue found several of the cargo

shorts to contain rubber banded bundles of cash.  Some of the bundles were labeled with

dollar amounts, most of which were labeled $2,000. The bundles were located one per

pocket of the cargo shorts, including both front pockets, both rear pockets and one or

both cargo pockets.  This was the case with nearly all of the pairs of cargo shorts

contained within the suitcase.  TFO Logue only observed one item within the suitcase

that appeared to be a personal effect owned prior to the trip, which was a

toothbrush/toothpaste contained in an exterior zippered pocket that was not within the

previously locked area of the suitcase.

33.     C. LECOMPTE stated she believed there to be $50-60k in her suitcase. C.

LECOMPTE claimed all the cash as her own and said she had been saving for about a

year or a year and a half.  TFO Logue inquired, again, as to how she makes money. C.

LECOMPTE then said, reluctantly, that she does online dancing through "Only Fans" and receives payments from customers via various payment apps and provided Venmo as an example.  When C. LECOMPTE described her activities, she described them as "stripping, and other things." TFO Logue inquired as to what she meant by "other things." C. LECOMPTE hesitantly replied by saying, "just things." TFO Logue asked if she participated in activities that may be considered illegal for money.  C. LECOMPTE said, "I don't prostitute, but I do things to get money."

34.     SA Lyons asked C. LECOMPTE about the currency. C. LECOMPTE claimed the cash was all hers and said there might be around $80,000. SA Lyons then asked about the cash located in the suitcase of one of her travel partners.  C. LECOMPTE hesitantly said all of the cash located, including the other suitcases, was hers and that there might be around $160,000, but she was not sure on the total.  After a couple minutes, C. LECOMPTE then said there might be $170,000 or $180,000 total and it was all hers.  C. LECOMPTE said she personally counted the cash and labeled the bundles that had labels.  C. LECOMPTE said the counts might be a little off because she counted them by hand.   I believe it is highly improbable that someone who saved $131,735, in wages, and who claimed to have hand counted the bundles, would not even have a rough idea of the amount of currency they possessed.

35.     SA Lyons asked C. LECOMPTE how C. LECOMPTE and her travel partners planned to get from Medford to Redding.  C. LECOMPTE stated they planned to rent a vehicle from the Medford Airport.  TFO Logue commented that that information contradicted what she had earlier said when she told TFO Logue they had a ride coming from Redding to pick them up.  C. LECOMPTE then said their ride was at the Medford

Airport already, but when their flight got delayed, the ride left without picking them up. TFO Logue commented that that did not make sense because the flight was only delayed by one hour.  C. LECOMPTE did not have a reply.

36.    Detective Lee asked C. LECOMPTE why she would travel with such a large amount of currency, to which C. LECOMPTE replied that she does not trust banks. C. LECOMPTE further said she brought the cash in case she found some type of investment while visiting.  TFO Logue asked why the cash was transported in bundles, separated into different pockets of clothing rather than carrying it with her.  C. LECOMPTE said she did not carry the cash with her because she did not want to get robbed.  C. LECOMPTE indicated the cash was packaged separately to avoid drawing attention to a large quantity of cash.  C. LECOMPTE repeatedly denied intending to purchase marijuana with the cash, although C. LECOMPTE said they were planning to go to dispensaries.  SA Lyons asked C. LECOMPTE about whether she filed taxes last year.  C. LECOMPTE said she did and said she made roughly $30,000 in 2019 (on taxes).  C. LECOMPTE told SA Lyons that she also babysat in 2019, contributing to her savings.  C. LECOMPTE told SA Lyons she saved about $50,000 in 2019.

37.    Detective Lee's search of the gray rolling suitcase belonging to C. LECOMPTE did not reveal any narcotics or cash.  The suitcase contained a pair of women's shoes and single bed sheet.  Taking up the majority of the suitcase was a smaller suitcase, which further contained various personal toiletries and women's clothing.

38.    TFO Logue, for verification, asked C. LECOMPTE if all the cash was hers.  C. LECOMPTE replied by saying that they each had their own luggage.  TFO Logue asked what that meant.  C. LECOMPTE then said that they each had their own

money.  TFO Logue asked C. LECOMPTE how much money belonged to the other two

people.  C. LECOMPTE said she would not answer for the others and that we could ask

them.

39.     Shortly before C. LECOMPTE left, she received a call on her phone from

a contact named "Bryce."  SA Lyons who was standing nearby asked if he could answer

the call and C. LECOMPTE said that he could.  SA Lyons answered the phone and

identified himself and told the caller that he was standing next to C. LECOMPTE.  The

caller said that they were attempting to text C. LECOMPTE information to show that the

currency was being used to purchase a property.  Until that point in the interview, no one

interviewed had mentioned the purchasing of real estate.

### Review of Bryce COLEMAN's Facebook Profile

40.     SA Lyons located a Facebook.com profile titled, "Bryce Coleman," who

posted on April 20, 2020, that he was in California.  The post contained a picture of a

white male adult with red hair and a beard, matching the appearance of a

subsequently obtained DMV photo for COLEMAN.  In the photograph, COLEMAN is

laying back on the floor against what agents estimated to be approximately 50-100

pounds of apparent marijuana bud contained within clear plastic bags.  A profile for

"Stephen LeCompte" "liked" the post.  Also associated with COLEMAN's profile, were

profiles for C. LECOMPTE and ALVIS.

41.     In another post COLEMAN posts a video on June 6, 2020, apparently of

himself by the context of the video, walking through a marijuana growing operation and

handling the plants.  SA Lyons preserved the video and screenshots of COLEMAN's

Facebook page.

42.     On August 4, 2020, SA Lyons called the number 504-508-XXXX.  When the call was answered, SA Lyons identified himself and asked if he was speaking with Bryce COLEMAN.  The user of the phone identified themselves as COLEMAN.  SA Lyons informed COLEMAN that he wanted to give C. LECOMPTE back her cellular phones and asked if she was available to talk.  COLEMAN stated that he was on boat on a lake near Redding, California but that he would see C. LECOMPTE that night and would have her call SA Lyons to coordinate the return of the phones.

### Surveillance of C. LECOMPTE

43.     On August 14, 2020, C. LECOMPTE came into the DEA Medford Resident Office with the intentions of retrieving her two cellular phones that were seized after her interview at the airport.  As C. LECOMPTE entered the lobby area of the office, both I and SA Lyons, who was also present, were hit with the strong odor of marijuana coming off C. LECOMPTE's person.  SA Lyons informed C. LECOMPTE that she would not be able to obtain her phones on that day and that she would need to return in the future once the authorizations had been approved.   As C. LECOMPTE was leaving, I observed her get into to the driver's seat of a 2012 Audi Q7 SUV, bearing California license plate 8NYY907 (Registered in her own name with an address of XXXX Granada Avenue Apartment #242, Santa Clara, California).  DMV records indicated that this vehicle had a lien on it starting December 16, 2019.  ALVIS was in the front passenger seat of the vehicle.  I found it suspicious for multiple reasons.   First, because C. LECOMPTE had not mentioned having residence in California during her previous interview.  Open source queries of the address listed on her vehicle's registration, indicated that rental rates for apartments at that address start at more than $2,000 per

month.  Second, I thought it was odd that C. LECOMPTE would be driving a luxury

SUV that she financed through a bank, given that C. LECOMPTE had informed

investigators during her interview that she was carrying the bulk currency because she

did not trust banks.

### Subpoena Response from Alaska Airlines

44.     On July 31, 2020, SA Lyons subpoenaed Alaska Airlines regarding flight

information for Caitlyn LECOMPTE, Stephen LECOMPTE, and Kerry ALVIS occurring

since January 1, 2020.  On August 3, 2020, Alaska airlines returned the subpoena.  The

subpoena return indicated that C. LECOMPTE had made three trips from New Orleans,

Louisiana to Medford, Oregon on an Alaska flight during that timeframe.  The subpoena

return indicated that S. LECOMPTE had made one trip from New Orleans to Medford on

an Alaska flight during that timeframe.  The subpoena return indicated that ALVIS had

made one trip from New Orleans to Medford on an Alaska flight during that timeframe.

45.     On February 8, 2020, a one-way ticket had been purchased for a flight for

C. LECOMPTE on February 9, 2020 from New Orleans to Medford for $1,055.81.  The

associated phone number was 504-508-XXXX (the same number SA Lyons had

previously used to contact COLEMAN).  The return indicated that C. LECOMPTE had

flown that day and had checked one bag.

46.     On April 16, 2020, a one-way ticket had been purchased for a flight for C.

LECOMPTE on April 18, 2020 from New Orleans to Medford for $323.00.  The

associated phone number was COLEMAN's number.  The return indicated that C.

LECOMPTE had flown that day and had checked one bag.

47.     On July 28, 2020, a one-way ticket had purchased for a flight for C. LECOMPTE and S. LECOMPTE on July 29, 2020 from New Orleans to Medford for $243.00.  The associated phone number was 530-227-XXXX.  A one-way ticket for ALVIS had also been purchased for this flight with the associated phone number 985-791-XXXX.  AVLIS, C. LECOMPTE, and S. LECOMPTE had each checked two bags. This is the flight after which AVLIS, C. LECOMPTE, and S. LECOMPTE were approached by investigators.

48.     Of note while reviewing the subpoena response was the lack of any return flight information.  Although it is possible that all three individuals could have used a different airline for their return flights, I believe it is more likely that they returned to Louisiana via rental car, while transporting marijuana with them.

**Search Warrants in McCloud, California**

49.     Through case de-confliction, SA Lyons discovered that Bryce COLEMAN's illegal marijuana cultivation activities were actively under investigation by Siskiyou County Sheriff's Office (SCSO).  On August 21, 2020 investigators from the SCSO, obtained and executed a search warrant at XXXX and XXXX Memeo Road, and California Assessor's Parcel Number (APN) 028-070-190-000, all located in McCloud, California.  There were three greenhouses located on APN 028-070-190-000, two of which were full of hundreds of growing marijuana plants.  1,801 marijuana plants were seized from the property in total.  Parked at the address was a 2015 Chevy Pickup Truck, bearing Louisiana Registration C704927, to Aldaberto PENA at XXX Jean Ellen Avenue, Houma, Louisiana.  There was mechanical service paperwork for the truck

present inside in COLEMAN's name with an associated address of XXXX Memeo Road, McCloud, California.

50.     Present at the location were Dustin James GALVAN (DOB: XX-XX-1989) and Sander Aldon REYNOLDS (DOB: XX-XX-1964).  GALVAN was interviewed and stated he has been at the property since April of 2020 and works on the property growing and maintaining the marijuana plants.  GALVAN stated his friend, who he did not identify, leased the property from a man named Hsui Chiang "Cliff" Chang (DOB: XX-XX-1966) for $20,000 per growing season.  GALVAN believed GALVAN would be paid between $25,000 and $30,000 for his work at the growing operation this season.

51.     REYNOLDS was interviewed and stated he works on the property growing and maintaining the marijuana plants and expected that he would be paid $20,000 for his work at the end of the season, though he had not been paid yet. REYNOLDS identified a male with a last name of CROSS, who is from Louisiana. REYNOLDS stated CROSS shows up to the operation and provides money for food and supplies to grow the plants.

52.     From XXXX Memeo Road, investigators recovered approximately 250 pounds of marijuana in various stages of processing, along with another approximate 28 pounds of marijuana processed and packaged for sale.  The marijuana packaged for sale appeared to be packaged in the same type of clear plastic bags that COLEMAN appeared to be holding in the previously identified photographs on COLEMAN's Facebook profile. Also recovered were multiple firearms, including two firearms that are illegal to possess in the state of California.

53.    Parked outside of XXXX Memeo Road, was the previously identified Audi Q7 SUV registered to C. LECOMPTE, though C. LECOMPTE was not present during the service of the search warrant.  Also present at the address was one of the suitcases from which the Currency was seized.  The suitcase was blue with yellow piping and clear plastic tape around the roller handle as it appeared when the currency was seized from it during C. LECOMPTE's interview at the Medford International Airport. Nearby the suitcase were multiple small paper handwritten labels like those originally affixed to the Currency, in amounts ranging from $1,000 to $5,000.  These labels would have been affixed to a different load of currency as the ones affixed to the Currency were also seized at the time.  The same clothing that the Currency was originally concealed within was also present nearby.  The handwriting appeared to be the same as the ones, which were seized with the Currency.  Also located within the residence was a money counting machine, and multiple pieces of mail in C. LECOMPTE's name with an address of XXXX Granada Avenue Apt. #242, Santa Clara, California.

54.    Candace CROSSWHITE, COLEMAN's girlfriend, was also present and identified COLEMAN as living there at the residence.

**Seizure of additional $135,000 in Oklahoma from S. LECOMPTE, COLEMAN, CROSS, and GALVAN on September 24, 2020**

55.    On September 25, 2020, I was contacted by Oklahoma DEA SA Quintin Cooper, who informed me that on September 24, 2020, his team, while conducting a highway traffic interdiction operation, had stopped a vehicle driven by COLEMAN, and occupied by S. LECOMPTE, Donald CROSS and Dustin GALVAN, on Highway 40

near mile marker 7.  A subsequent search of the vehicle resulted in the discovery and

seizure of $135,000, which was hidden in the jack storage area of the vehicle, two

handguns, and three small plastic baggies of marijuana.  COLEMAN was interviewed

and claimed ownership of one of the pistols and stated he had started his travels in Weed,

California, but denied knowledge of the currency secreted inside of the vehicle.

COLEMAN claimed that he had rented the vehicle from a guy named "Chang" who owns

a Mexican restaurant named "Dos Amigos" in Weed, California.  None of the occupants

of the vehicle claimed ownership of the currency.

## **CONCLUSION**

56.    Based on the foregoing and my training and investigative experience, I

have probable cause to believe that the $131,735.00 in U.S. currency seized from C.

LECOMPTE on July 29, 2020, is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6),

as moneys furnished or intended to be furnished by any person in exchange for a

controlled substance, proceeds traceable to such an exchange, or moneys used or intended

to be used to facilitate violations of 21 U.S.C § 841(a)(1).

I declare under penalty of perjury that the foregoing is true and correct pursuant to

28 U.S.C. §1746.

Executed this 25th day of January 2021.


*s/David Wentworth*
David Wentworth
Special Agent, DEA


Declaration of David Wentworth                                                    Page 28

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America

**DEFENDANTS**
$131,735.00 U.S. Currency, in rem

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Jackson
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Judith Rose Harper - United States Attorney's Office
310 West 86h Street, Medford, OR 97501

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☒ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
21:881(a)(6) / 21:841 and 846
Brief description of cause:
forfeiture of controlled substance proceeds used or intended to be used in drug trafficking

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE
1/25/2021

SIGNATURE OF ATTORNEY OF RECORD
s/ Judith R. Harper

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____